HARRISON, insurance commissioner, *v.* HARTFORD
STEAM-BOILER INSPECTION AND INSURANCE
COMPANY *et al.*

No. 11191.   JUNE 13, 1936.   ADHERED TO ON REHEARING, JULY 28, 1936.

*M. J. Yeomans, attorney-general,* and *B. D. Murphy, assistant attorney-general,* for plaintiff in error.

*Harold Hirsch, Marion Smith,* and *Hamilton Lokey,* contra.

RUSSELL, Chief Justice.   The Hartford Steam Boiler Inspection and Insurance Company, a non-resident corporation licensed to transact business as a casualty insurance company in the State of Georgia, and W. M. Francis, of Fulton County, Georgia, filed a petition for mandamus against William B. Harrison as insurance commissioner of Georgia, praying that the defendant be compelled by mandamus to issue to W. M. Francis a license as an insurance agent for the writing of casualty insurance.   It was alleged that the insurance company filed with the insurance commissioner an application for the issuance of such license to Francis; that the insurance commissioner declined to issue the license solely upon the ground that under section 1 of the act of the General Assembly approved March 28, 1935 (Ga. L. 1935, p. 139), prescribing the terms on which the insurance commissioner was authorized to license insurance agents, no salaried employees of an insurance company should be licensed to act as agent or to issue contracts of insurance, except employees of mutual insurance companies; that this provision of the act of 1935 is violative of the fourteenth amendment to the constitution of the United States, in that said provision is arbitrary, unreasonable, and capricious, and bears no reasonable relation to the public or to any other matter or thing within the police power of the State, and deprives the petitioners of their property and of their liberty, without due process of law; that for the same reason said act violates art. 1, sec. 1, par. 3, of the constitution of Georgia, wherein it is provided that no person shall be deprived of property without due process of law; that said

statute, in discriminating against stock companies and the agents thereof and in favor of mutual companies and the agents thereof, sets up an arbitrary and capricious classification bearing no reasonable relation to the subject-matter of the legislation, and no reasonable relation to the protection of the public, or any other matter within the legislative authority; and that said provision is also violative of art. 1, sec. 1, par. 2, of the constitution of Georgia, providing that protection to person and property is the paramount duty of government, and shall be impartial and complete. The insurance commissioner in his response admitted that the license prayed for had been refused solely on the ground that Francis was a salaried employee of the insurance company, and that under the terms of the act of 1935 he was ineligible to be so licensed. The judge of the superior court, upon the pleadings, granted a mandamus absolute, requiring the insurance commissioner to issue the license prayed, holding that the classification made in the act of 1935 is unconstitutional. To this judgment the insurance commissioner excepted.

■ The superior court having by mandamus ordered the insurance commissioner of Georgia to issue a license to W. M. Francis, the local agent for the Hartford Steam Boiler Inspection and Insurance Company at Atlanta, and the commissioner having excepted by bill of exceptions, the question is presented as to whether the act approved March 28, 1935, upon the subject of agents and solicitors of insurance is unconstitutional. The superior court held that section 1 of the foregoing act (Ga. L. 1935, p. 139) is violative of the fourteenth amendment to the constitution of the United States (Code, § 1-815), and in conflict with sec. 1, art. 1, par. 2 and par. 3 of the constitution of Georgia (Code, §§ 2-102, 2-103). If, as charged in the petition for mandamus in this case, the classification made by the General Assembly in the passage of this act is arbitrary, capricious, and not based upon any reasonable ground, but upon grounds which have no reasonable relation to the subject of fire insurance, it should be admitted that section 1 of the act of 1935, which it is sought to obliterate from the statute books, is unconstitutional. If the General Assembly, in the passage of this legislation with relation to fire-insurance companies, exceeded its constitutional power to classify businesses in determining the regulations to be applied to occupational taxes, it is unconstitu-

tional. But a court can not lightly declare an act of the General Assembly unconstitutional; for every presumption is in favor of the constitutionality of the acts of the legislative department of the State government, and it is a fixed rule that if there should be a doubt upon the subject the doubt must be resolved in favor of its constitutionality. It is not to be denied that there is a limit to the power of classification beyond which the State of Georgia can not go. A mere difference in the nature or character of two businesses which it is sought to regulate by legislative enactment will not be sufficient to justify separate classification of each business into different classes. But if a business is affected with a great public interest in which all of the citizens of the State are concerned, and injury will result to the general public unless regulatory control be applied, a right of classification arises on behalf of the general public. It must be recognized that the State of Georgia has an inherent, sovereign right to properly classify all businesses carried on within its borders, and the State could rightfully even altogether forbid a particular business being carried on within the State. That which a State may do with corporations of its own creation it may do with foreign corporations admitted into it. Hooper v. California, 155 U. S. 648, 652 (15 Sup. Ct. 207, 39 L. ed. 297), cited, approved, and applied in Orient Insurance Co. v. Daggs, 172 U. S. 557, 562 (supra). In the latter case it was said: "It is not necessary to state the reasoning upon which classification by legislation is based or justified. This court has had many occasions to do so, and only lately reviewed the subject in Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283 [18 Sup. Ct. 594, 42 L. ed. 1037]. We said in that case that 'the State may distinguish, select, and classify objects of legislation, and necessarily the power must have a wide range of discretion.' And this because of the function of legislation and the purposes to which it is addressed. Classification for such purposes is not invalid because not depending on scientific or marked differences in things or persons or in their relations. It suffices if it is practical, and is not reviewable unless palpably arbitrary. The classification of the Missouri statute is certainly not arbitrary. We see many differences between fire insurance and other insurance, both to the insurer and the insured—differences in the elements insured against and the possible relation of the parties to them, producing

consequences which may justify if not demand different legislative treatment. Of course it is not for us to debate the policy of any particular treatment, and the freedom of discretion which we have said the State has exhibited by analogous if not exact examples to the Missouri statute in Railway Company v. Mackey, 127 U. S. 204, 208 [8 Sup. Ct. 1161, 32 L. ed. 107], and in Minneapolis & St. Louis Railway v. Beckwith, 129 U. S. 26 [9 Sup. Ct. 207, 32 L. ed. 585]."

If the Hartford Steam Boiler Inspection and Insurance Company, one of the applicants for mandamus, is a foreign corporation, it has no inherent right to a license which the courts of this State are required to recognize or enforce by mandamus. Mr. Francis, the applicant for a license as the local agent, being a citizen of this State, the question will be considered as to him. One of the reasons upon which it is claimed that the act of the General Assembly now under consideration is unconstitutional is that it interferes with and destroys the right of contract. As to this we will use the language of Mr. Justice Holmes of the Supreme Court of the United States, where he said, in a dissenting opinion in Adkins v. Children's Hospital, 261 U. S. 525, 568 (43 Sup. Ct. 394, 67 L. ed. 785), that a contract is "merely an example of doing what you want to do, embodied in the word liberty. But pretty much all law consists in forbidding men to do some things that they want to do, and contract is no more exempt from law than other acts. Without enumerating all the restrictive laws that have been upheld, I will mention a few that seem to me to have interfered with liberty of contract quite as seriously and directly as the one before us. Usury laws prohibit contracts by which a man receives more than so much interest for the money that he lends. Statutes of frauds restrict many contracts to certain forms. Some Sunday laws prohibit practically all contracts during one seventh of our whole life. Insurance rates may be regulated. German Alliance Insurance Co. v. Lewis, 233 U. S. 389" (supra). See other instances cited therein, as to the control properly exercised by government over contract, on page 569 of Adkins v. Children's Hospital, supra. In German Alliance Insurance Co. v. Lewis, supra, dealing with the business of fire insurance as to the case now under consideration, the Supreme Court of the United States held that the business of insurance is so far affected with the public interest as to justify legislative regulation (legislative regula-

tion of rates); "a public interest can exist in a business, such as insurance, distinct from a public use of property, and can be the basis of the power of the legislature to regulate the personal contracts involved in such business; where a business, such as insurance, is affected by a public use, it is the business that is the fundamental thing; property is but the instrument of such business. Munn *v*. Illinois, 94 U. S. 113 [24 L. ed. 77]; Budd *v*. New York, 143 U. S. 517 [12 Sup. Ct. 468, 36 L. ed. 247]; Brass *v*. North Dakota, 153 U. S. 391 [14 Sup. Ct. 857, 38 L. ed. 757], demonstrate that a business by circumstances and its nature may rise from private to public concern and consequently become subject to governmental regulation; and the business of insurance falls within this principle; the fact that a contract for insurance is one for indemnity and is personal does not preclude regulation; a general conception of the lawmaking bodies of the country that a business requires governmental regulation is not accidental and can not exist without cause; what makes for the general welfare is matter of legislative judgment, and judicial review is limited to power, and excludes policy; the liberty of contract guaranteed by the fourteenth amendment is not more intimately involved in price regulation than in other proper forms of regulation of business and property affected by a public use, and so *held* as to the regulation of rates of fire insurance; the inactivity of a governmental power, no matter how prolonged, does not militate against its legality when exercised. United States *v*. Delaware & Hudson Co., 213 U. S. 366 [29 Sup. Ct. 527, 53 L. ed. 836]. Whether rate regulation is necessary in regard to a particular business affected by a public use, such as insurance, is matter for legislative judgment. This court can only determine whether the legislature has the power to enact it; a discrimination is not invalid under the equal-protection provision of the fourteenth amendment if not so arbitrary as to be beyond the wide discretion that a legislature may exercise; and so *held* as to a classification exempting farmers' mutual insurance companies doing only a farm business from the operation of an act regulating rates of insurance; a legislative classification may rest on narrow distinctions. Legislation is addressed to evils as they appear, and even degrees of evil may determine its exercise. Ozan Lumber Co. *v*. Union National Bank, 207 U. S. 251 [28 Sup. Ct. 89, 52 L. ed. 195]."

Louisville & Nashville R. Co. *v.* Mottley, 219 U. S. 467, 480 (31 Sup. Ct. 265, 55 L. ed. 297, 34 L. R. A. (N. S.) 671), was a case in which a contract had been made by a railroad company with Mottley and his wife, in settlement for injuries inflicted by the railroad company upon the latter, in consideration of which the railroad promised that as long as either husband or wife lived they should have annual free passes over the railroad and all of its branches. The promise of the railroad as embodied in the contract was complied with for many years, but after the passage of legislation forbidding the issuance of passes, save with certain specified exceptions, the railroad violated the contract upon the ground that it was without authority to comply. Suit was brought in the courts of Kentucky. The State circuit court required the railroad to issue to each of the plaintiffs a pass for the year 1909, and thereafter to renew such passes annually during their respective lives. This judgment was affirmed by the Court of Appeals of Kentucky, and the case was taken by the railroad company to the Supreme Court of the United States, and there the judgment was reversed on the ground that the government had the right to destroy the contract if contrary to public policy expressed by Congress in the passage of the act forbidding the issuance of passes. It seems to us that this decision is conclusive upon the point that the legislature of Georgia has the right, in exercising the public policy of the State, to determine what contracts and the kind of contracts that shall be lawful to those who desire to carry on a business which is impressed with a general public interest. We have shown that this principle has been uniformly recognized by the Supreme Court of the United States. In the Mottley case, supra, after holding that the agreement to furnish passes was valid, the court said: "We now come to the question whether, assuming that the agreement of 1871 was valid when made, could Congress by any statute subsequently enacted make its enforcement by suit impossible? There are certain propositions at the base of this inquiry which we need not discuss at large, because they have become thoroughly established in our constitutional jurisprudence. One is, that the power granted to Congress to regulate commerce among the States and with foreign nations is complete in itself, and is unrestricted except by the limitations upon its authority to be found in the constitution. Gibbons *v.* Ogden, 9 Wheat. 1 [6

L. ed. 23]; Brown *v.* Maryland, 12 Wheat. 419 [6 L. ed. 678]; Addyston Pipe and Steel Co. *v.* United States, 175 U. S. 211, 229 [20 Sup. Ct. 96, 44 L. ed. 136]; Scranton *v.* Wheeler, 179 U. S. 141, 162, 163 [21 Sup. Ct. 48, 45 L. ed. 126]; C., B. & Q. R. R. Co. *v.* Drainage Com'rs, 200 U. S. 561 [26 Sup. Ct. 341, 50 L. ed. 596]; Union Bridge Co. *v.* United States, 204 U. S. 364, 400 [27 Sup. Ct. 367, 51 L. ed. 523]; Atlantic Coast Line &c. *v.* Riverside Mills, 219 U. S. 186, 202 [31 Sup. Ct. 164, 55 L. ed. 167, 31 L. R. A. (N. S.) 7]. In the Addyston Pipe case, this court said, that, under its power to regulate commerce, Congress 'may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any substantial extent interstate commerce.' . . In the Addyston Pipe case (p. 228 above cited), the court said: 'We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts.'" These principles of nation-wide application as to Congressional legislation are no less applicable in cases of State legislation affecting its power to act within the limits of a sovereign State. These principles are ancient. In Atkinson *v.* Ritchie, 10 East. 530, 534, it was said: "That no contract can properly be carried into effect, which was originally made contrary to the provisions of law, or which, being made consistently with the rules of law at the time, has become illegal in virtue of some subsequent law, are propositions which admit of no doubt." In Pomeroy on Contracts, § 280 (Specific Performance), after observing that an illegal contract can not be made the basis of any judicial proceeding and that no action in law or equity could be maintained upon it, it is stated: "This impossibility of enforcement exists, whether the agreement is illegal in its inception, or whether, being valid when made, the illegality has been created by a subsequent statute." In Parsons on Contracts (6th ed.), 675, it is said: "If one agrees to do a thing which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise." Further citation of authorities would seem unnecessary. They are very numerous and are all one way.

The learned counsel for the defendant in error refers us to the case of Adkins *v*. Children's Hospital, 261 U. S. 525 (supra), and seems to rely largely upon that authority. We have no complaint or criticism of the decision, and, so far as it is apposite to the proposition now before us, what we hold is in accord therewith. However, we must say in all frankness that we are not greatly impressed by the contention that the ruling in that case supports the position of the defendant in error. We may remark in passing that the Adkins case expresses only the opinion of five out of nine Justices of the court. Mr. Justice Brandeis did not participate, while Mr. Chief Justice Taft (with whom concurred Mr. Justice Sanford) wrote a vigorous dissent, and Mr. Justice Holmes on his part did the same thing. The court was only reviewing a decision of a board to which Congress had delegated the enforcement of an act of September, 1918, providing for the fixing of minimum wages of women in the District of Columbia. The act provided for "a board of three members to be constituted as far as practicable so as to be representative of employers, employees and the public." The board was authorized to have public meetings at which persons interested in the matter to be investigated might appear and testify, and to administer oaths, issue subpœnas requiring the attendance of witnesses and production of books, etc., and to make rules and regulations for carrying the act into effect. Other provisions of this act were quoted by Mr. Justice Sutherland, the author of the majority opinion. The Congressional legislation under review related solely to labor and the problems growing out of the employment of labor. We question whether, under any classification or definition fire-insurance agents can be classed as *laborers* in the sense in which that term is usually employed in litigation affecting the right of employees who are laborers, as in the Adkins case. In the course of the opinion Mr. Justice Sutherland made a separate division of those who might be subject to the act of Congress then under review by the Supreme Court of the United States, dividing it into four distinct classes to which we shall presently refer. As to this classification Mr. Justice Sutherland, speaking for a majority of the court, said: "There is, of course, no such thing as absolute freedom of contract. It is subject to a great variety of restraints. But freedom of contract is, nevertheless, the general rule, and restraint the exception; and

the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances. Whether these circumstances exist in the present case constitutes the question to be answered. It will be helpful to this end to review some of the decisions where the interference has been upheld, and consider the grounds upon which they rest. (1) Those dealing with statutes fixing rates and charges to be exacted by businesses impressed with a public interest. . . (2) Statutes relating to contracts for the performance of public work. . . (3) Statutes prescribing the character, method, and time for payment of wages. . . (4) Statutes fixing hours of labor." The last three subdivisions have no reference or application to such a case as is now before us. The first is applicable, but it furnishes no support to the contention of the defendant in error. As stated by Mr. Justice Sutherland, the case of Munn v. Illinois, 94 U. S. 113, is sufficient citation to support the proposition that there may be an interference with a contract as to those dealing with statutes fixing charges to be exacted or contracts made by businesses impressed with a public interest. Munn's case states: "1. Under the powers inherent in every sovereignty, a government may regulate the conduct of its citizens toward each other, and, when necessary for the public good, the manner in which each shall use his own property. 2. It has, in the exercise of these powers, been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, millers, wharfingers, innkeepers, &c., and, in so doing, to fix a minimum of charge to be made for services rendered, accommodations furnished, and articles sold. 3. Down to the time of the adoption of the fourteenth amendment of the Constitution of the United States, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not under all. The amendment does not change the law in this particular; it simply prevents the States from doing that which will operate as such deprivation."

Treating, as we do, that one's right to contract is property of which he can not be deprived except by due process of law, we proceed to the holding in the Munn case (supra), as stated in headnotes 5 and 6: "Rights of property, and to a reasonable compen-

sation for its use, created by the common law, can not be taken away without due process; but the law itself, as a rule of conduct, may, unless constitutional limitations forbid, be changed at the will of the legislature [as has been done by the legislature of Georgia in this instance in the passage of the act of 1935]. The great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. . . The limitation by legislative enactment of the rate of charges [or likewise the method of compensation] for services rendered in a public employment, or for the use of property in which the public has an interest, establishes no new principle in the law, but only gives a new effect to an old one." The Supreme Court of the United States concluded by saying, in headnote 10, that "The act of the General Assembly of Illinois, entitled 'An act to regulate public warehouses and the warehousing and inspection of grain, and to give effect to art. 13 of the constitution of this State,' approved April 25, 1871, is not repugnant to the constitution of the United States." In delivering the opinion of the court Mr. Chief Justice Waite said: "The question to be determined in this case is whether the General Assembly of Illinois can, under the limitations upon the legislative power of the States imposed by the constitution of the United States, fix by law the minimum of charges for the storage of grain in warehouses at Chicago and other places in the State having not less than one hundred thousand inhabitants, 'in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved.' It is claimed that such a law is repugnant—1. To that part of sect. 8, art. 1, of the constitution of the United States, which confers upon Congress the power 'to regulate commerce with foreign nations and among the several States;' 2. To that part of sect. 9 of the same article, which provides that 'no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another;' and 3. To that part of amendment 14, which ordains that no State shall 'deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' We will consider the last of these objections first. Every statute is presumed to be consti-

tutional. The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained. The constitution contains no definition of the word 'deprive,' as used in the fourteenth amendment. To determine its signification, therefore, it is necessary to ascertain the effect which usage has given it, when employed in the same or a like connection. While this provision of the amendment is new in the constitution of the United States, it is old as a principle of civilized government. It is found in Magna Charta, and, in substance if not in form, in nearly or quite all the constitutions that have been from time to time adopted by the several States of the Union. By the fifth amendment it was introduced into the constitution of the United States, as a limitation upon the power of the national government, and by the fourteenth, as a guaranty against any encroachment upon an acknowledged right of citizenship by the legislatures of the States.

"When the people of the United Colonies separated from Great Britain, they changed the form, but not the substance, of their government. They retained for the purposes of government all the powers of the British Parliament, and, through their State constitutions, or other forms of social compact, undertook to give practical effect to such as they deemed necessary for the common good and the security of life and property. All the powers which they retained they committed to their respective States, unless in express terms or by implication reserved to themselves. Subsequently, when it was found necessary to establish a national government for national purposes, a part of the powers of the States and of the people of the States was granted to the United States and the people of the United States. This grant operated as a further limitation upon the powers of the States, so that now the governments of the States possess all the powers of the Parliament of England, except such as have been delegated to the United States or reserved by the people. The reservations by the people are shown in the prohibitions of the constitutions. When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. 'A body politic,' as aptly defined in the preamble of the constitution of Massachusetts, 'is a social compact by which the whole people covenants with each citizen, and each

citizen with the whole people, that all shall be governed by certain laws for the common good.' This does not confer power upon the whole people to control rights which are purely and exclusively private. Thorpe *v.* R. & B. Railroad Co., 27 Vt. 143 [62 Am. D. 625]. But it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and has found expression in the maxim sic utere tuo ut alienum non lædas. From this source come the police powers, which, as was said by Mr. Chief Justice Taney in the Licenses Cases, 5 How. 583 [12 L. ed. 292], 'are nothing more or less than the powers of government inherent in every sovereignty, . . that is to say, . . the power to govern men and things.' Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. . . This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the constitution protects, we find that when private property is 'affected with a public interest, it ceases to be juris privati only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise De Portibus Maris, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." After referring at length to two statements of Lord Hale, it was stated that "his statement of the law was cited with approbation and acted upon by Lord Kenyon at the beginning of the present century [then the 19th century], in Bolt *v.* Stennett, 8 T. R. 606."

The statement in the Munn case on page 133 is in our opinion

clearly applicable to the business of fire insurance involved in the present case: "Neither is it a matter of any moment that no precedent can be found for a statute precisely like this. It is conceded that the business is one of recent origin, that its growth has been rapid, and that it is already of great importance. And it must also be conceded that it is a business in which the whole public has a direct and positive interest. It presents, therefore, a case for the application of a long-known and well-established principle in social science, and this statute simply extends the law so as to meet this new development of commercial progress. There is no attempt to compel these owners to grant the public an interest in their property, but to declare their obligations, if they use it in this particular manner. . . If they did not wish to submit themselves to such interference, they should not have clothed the public with an interest in their concerns. . . It is insisted, however, that the owner of property is entitled to a reasonable compensation for its use, even though it be clothed with a public interest, and that what is reasonable is a judicial and not a legislative question. . . The controlling fact is the power to regulate at all. . . But a mere common-law regulation of trade or business may be changed by statute. A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and. is no more sacred than any other. Rights of property which have been created by the common law can not be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by the constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. To limit the rate of charge for services rendered in a public employment, or for the use of property in which the public has an interest, is only changing a regulation which existed before. It establishes no new principle in the law, but only gives a new effect to an old one." Munn *v.* Illinois, 94 U. S. 113, 133 (supra).

Our sister State of South Carolina has an act approved March 2, 1916, which provides "for the licensing of insurance brokers," defined to be "such person as shall be licensed by the insurance commissioner to represent citizens" of the State "for the placing of

insurance in insurers" in the "State or in any other State or country." Section 2 of the act prescribes, among other conditions, that only such persons may be licensed as are residents of the State and have been licensed insurance agents of the State for at least two years. La Tourette offered to comply with all the provisions of the act, but could not comply with the requirement of section 2, he being, as he alleged, a resident and citizen of New York; and he attacked the requirement by a petition in the Supreme Court of South Carolina, in which he charged it to be a violation of the constitution of the State, and of section 2 of article 4 and the fourteenth amendment of the constitution of the United States, in that he, a citizen of New York, was denied the privileges and immunities granted to citizens of the State of South Carolina, and deprived of liberty and property without due process of law. He further alleged that the commissioner had refused to issue a license to him, and prayed that he be required to do so. The court sustained a demurrer and dismissed the petition. Mr. Justice McKenna, speaking for the Supreme Court of the United States, said, in the opinion rendered in the case appealed to that court, La Tourette v. McMaster, 248 U. S. 465 (39 Sup. Ct. 160, 63 L. ed. 362) : "The pleadings and the action of the court indicate the question in the case, and, it would seem, the elements of it. . . They seem to be (1) That La Tourette is deprived of his liberty and a property right by the act of the State, in violation of the due-process clause of the fourteenth amendment. (2) That the act discriminates against citizens of other States in favor of citizens of the State of South Carolina, in violation of § 2, article IV, of the Constitution of the United States. (1) This contention depends upon the character of the business of insurance, and it was decided in German Alliance Insurance Co. v. Lewis, 233 U. S. 389 [supra], to be clothed with a public interest, and subject, therefore, to the regulating power of the State. And it necessarily follows that as insurance is affected with a public interest, those engaged in it or who bring about its consummation are affected with the same interest and subject to regulation as it is. A broker is so engaged—is an instrument of such consummation. The statute makes him the representative of the insured. He is also the representative of the insurer (Hooper v. California, 155 U. S. 648, 657 [supra]), and his fidelity to both may be the

concern of the State to secure. As said by the Supreme Court of the State: 'It is important for the protection of the interests of the people of the State that the business should be in the hands of competent and trustworthy persons. And we may say that this result can be more confidently and completely secured through resident brokers, they being immediately under the inspection of the commissioner of insurance. The motive of the statute, therefore, is benefit to insurer and insured, and the means it provides seem to be appropriate. But we need not cast about for reasons for the legislative judgment. We are not required to be sure of the precise reasons for its exercise, or be convinced of the wisdom of its exercise.' It is enough if the legislation be passed in the exercise of a power of government and has relation to that power. Rast v. Van Deman & Lewis Co., 240 U. S. 342, 365, 366 [36 Sup. Ct. 370, 60 L. ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455], and cases cited; also Bunting v. Oregon, 243 U. S. 426, 437 [37 Sup. Ct. 435, 61 L. ed. 830, Ann. Cas. 1918A, 1043]. (2) This contention, that is, that the act discriminates against citizens of other States and thereby offends the constitution of the United States, is La Tourette's ultimate reliance, and to it his counsel devote their entire argument. The State replies its power over insurance and that the legislation it justifies extends to its agents and is best executed when they are residents of the State. This view we have sustained, and manifestly to declare the legislation illegal is to put a restraint upon a power that has practical justifications. The illegality of the act is, however, earnestly urged, and that it is a 'trade regulation' and recognizes 'the business, trade, or occupation of an insurance broker as proper and legitimate,' and yet denies to La Tourette, a citizen of New York, the right to engage in it, and thereby abridges the privileges and immunities that he has as a citizen. The contention is expressed and illustrated in a number of ways, and the privilege of a citizen is defined to be 'the right to pursue and obtain happiness and safety' and 'to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others,' and that whatever rights a State grants to its own citizens are the measure within its jurisdiction of the rights of the citizens of other States; and for these propositions Slaughter-House Cases, 16 Wall. 36 [21 L. ed. 394], and Butchers' Union Co. v. Crescent City Co., 111 U. S. 746 [4 Sup.

Ct. 652, 28 L. ed. 585], are cited. Other cases are also cited in illustration. We do not dispute the propositions, and to see if they determine against the act under review we must turn to its words,· as did the Supreme Court of the State, whose interpretation of them we must accept. It said, speaking by Mr. Justice Hydrick: 'A citizen of any State of the Union who is a resident of this State and has been a licensed insurance agent of this State for at least two years may obtain a broker's license; on the other hand, a citizen of this State, who is not a resident of the State and has not been a licensed insurance agent of this State for two years, may not be licensed. No discrimination is made on account of citizenship. It rests alone on residence in the State and experience in the business.' And the court further said: 'Citizenship and residence are not the same thing, nor does one include the other. Cummings v. Wingo, 31 S. C. 427, 435, 10 S. E. 107, and authorities cited. But our conclusion is not rested upon the mere use of the word 'residents'; for no doubt it might appear from the purpose and scope of an act that 'residents' was used in the sense of 'citizens.' If so, the court would so construe it; and in no event would the court sanction an evasion of the purpose and intent of this wise and wholesome provision of the constition based on mere verbiage."

In support of the contention that the act of 1935 now under review is unconstitutional, we are cited by counsel for the defendant in error to the case of Liggett Co..v. Baldridge, 278 U. S. 105 (49 Sup. Ct. 57, 73 L. ed. 45), in which the plaintiff assailed the constitutionality of a Pennsylvania act providing that every pharmacy or drug-store shall be owned only by a licensed pharmacist,· and, in the case of corporations, associations, and copartnerships, requires that all the partners or members thereof shall be licensed pharmacists with certain stated exceptions. The Liggett Company was a Massachusetts corporation authorized to do business in Pennsylvania. At the time of the passage of the act it was empowered to own and conduct, and thereafter continued to own and operate, a number of drug-stores in that State, and intended to carry on a retail business under the title of "drug-store" or "pharmacy." All of the stockholders were not registered pharmacists, and the Pennsylvania State Board of Pharmacy refused to grant the company a permit to carry on the business. The State attorney-general and

the district attorney of the county threatened to prosecute for a violation of the act. Suit was brought to enjoin them, on the ground that the act contravened the due-process and equal-protection clauses of the fourteenth amendment. The State court refused an injunction, and finally dismissed the bill for want of equity. Liggett took the case to the Supreme Court of the United States, and that court reversed the judgment of the lower court. Justices Holmes and Brandeis dissented. That decision can not affect the ruling we have made, nor can the authorities to which we are cited. The act of 1935 with reference to fire insurance concerns a matter affected with a public interest, and no such question was presented or could be presented by the Liggett case. The company was merely conducting a private business of selling drugs. It was summed up by Mr. Justice Sutherland as follows: "In the light of the various requirements of the Pennsylvania statutes, it is made clear, if it were otherwise doubtful, that mere stock ownership in a corporation, owning and operating a drug-store, can have no real or substantial relation to the public health; and that the act in question creates an unreasonable and unnecessary restraint upon private business. . . The claim that mere ownership of a drug-store by one not a pharmacist bears a reasonable relation to the public health finally rests upon conjecture, unsupported by anything of substance. This is not enough; and it becomes our duty to declare the act assailed to be unconstitutional as in contravention of the due-process clause of the fourteenth amendment."

We do not deem the case of Adair *v.* United States, 208 U. S. 161 (28 Sup. Ct. 277, 52 L. ed. 436), as apposite or applicable to the case before us. The Adair case involved the question whether it was within the power of Congress to make it a criminal offense against the United States for a carrier engaged in interstate commerce to discharge an employee simply because he was a member of a labor organization; and the court properly held that the Federal law was an invasion of the personal liberty as well as of the right of property, and therefore unenforceable under the provisions of the fourteenth amendment which declares that no person shall be deprived of his liberty or property without due process of law. The case of Coppage *v.* Kansas, 236 U. S. 1 (35 Sup. Ct. 240, 59 L. ed. 441, L. R. A. 1915C, 960), related to a Kansas statute declaring it a misdemeanor punishable by fine or imprisonment for

an employer to require an employee to agree not to become or to remain a member of any labor organization during the time of his employment, practically the converse of the question involved in the Adair case, supra, so far as employer and employee are concerned. There is nothing in the decision as to the question of membership in labor organizations which is apposite to the Georgia case which we have under consideration. As pointed out in *Carlton* v. *Southern Mutual Insurance Co., 72 Ga.* 371, the legislature seemed to be well aware of what this court and every other court knows, that a local agent is largely dependent upon insurers for being able to procure any business, and that one who wishes to insure his home generally takes his insurance to a friend in whom he has confidence; and for this reason, under section 1 of the act of 1935, a salaried officer of a stock-insurance company could not be a local agent. We are not concerned with what was the real reason; for this is a question for the General Assembly, and not for the courts, to determine. We have judicial knowledge of the size and approximate population of the various towns in Georgia; and if local agents, who are best qualified to deal with the public, are placed upon salaries, there would in a very short time be no local agents in any of the various small towns and villages in which there is a need for fire insurance.

So recently as March 2, 1936, the Supreme Court of the United States, in Bayside Fish Flour Co. *v.* Gentry, 297 U. S. (56 Sup. Ct. 513, 80 L. ed. 522), decided that a California statute regulating manufacture, canning, and packing of sardines within the State was not an unlawful interference with interstate commerce, since, to the extent that the act regulated the use of fish brought into the State from the outside, it was justified as a shield against covert depletion of local supply; also, that the statute limiting the taking of sardines for use in a reduction plant and prohibiting the use of any part of fish except offal in a reduction plant or by a reduction process did not deny due process, as against the contention that it deprived the owner of the reduction plant of the right to contract for the purchase of sardines taken from the high seas and brought into the State. Thereupon the court held, what is applicable in this State, that the statute does not become unconstitutional merely because it has created a condition of affairs which renders ineffective the making of a related contract lawful

in itself. It was also decided in that case that whether legislative discretion within its prescribed limits should be exercised in a particular manner is matter for judgment of the legislature, and earnest conflict of serious opinion does not suffice to bring it within the range of judicial cognizance; also, that legislative classification is not objectionable as arbitary merely because inequality actually results. Upon the question as to whether the statute has any reasonable relation to the object of the enactment —viz., the conservation of the fish supply in the State—the court said that "we can not invalidate them [the provisions of the statute] because we might think, as appellant in effect urges, that they will fail or have failed of their purpose. McLean v. Arkansas, 211 U. S. 539, 547-548 [29 Sup. Ct. 206, 53 L. ed. 315]. Nor can we declare the provisions void because it might seem to us that they enforce an objectionable policy or inflict hardship in particular instances. Chicago &c. Railroad v. Nebraska, 170 U. S. 57, 77 [18 Sup. Ct. 513, 42 L. ed. 948]. And see generally Chicago, B. & Quincy R. R. Co. v. McGuire, 219 U. S. 549 [31 Sup. Ct. 259, 55 L. ed. 328]. 'Whether the enactment is wise or unwise' this court said in that case (219 U. S. p. 569), 'whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." This was said after it was ruled, in the preceding paragraph of the opinion, that "The point that the provisions of the fish and game code deprive appellant of its property without due process of law seems to be based upon the contention that appellant is denied the right to contract for the purchase of sardines taken from the high seas and brought into the State. Assuming the point to have been properly raised below, which is by no means clear, it is without merit. Undoubtedly the right to contract, with some exceptions, is a liberty which falls within the protection of the due-process clause of the fourteenth amendment. Adkins v. Children's Hospital, 261 U. S. 525, 545-546 [supra], and cases cited. Plainly enough, however, that right is not directly interfered with by the legislative provisions in question. Nor, because

they may operate indirectly as a deterrent, do they, in the sense of the constitution, deprive appellant of the liberty of contract. A statute does not become unconstitutional merely because it has created a condition of affairs which renders the making of a related contract, lawful in itself, ineffective." The court concluded by saying: "We have considered the arguments of appellant tending to a different conclusion than that which we have reached; but at most these arguments do no more than demonstrate that the question is debatable. And, if so, the effect of the action of the State legislature in passing the statute was to decide this debatable question against the view now advanced by appellant; and since we are unable to say that such a determination by the legislature is clearly unfounded, we are precluded from overturning it. Radice v. New York, 264 U. S. 292, 294 [44 Sup. Ct. 325, 68 L. ed. 690]."

The employment of agents is a mere incident in the business of insurance and the instrumentality thereof, no matter how necessary to the business. Contracts for insurance on the part of a non-resident insurance company might be made by correspondence, should the non-resident company be unwilling to obey the regulations imposed by this State as to resident agents within this territory. In this respect the case at bar is not unlike that of *Williams* v. *Fears*, 110 *Ga.* 584 (35 S. E. 699, 50 L. R. A. 685), which was reviewed by the Supreme Court of the United States. 179 U. S. 270 (21 Sup. Ct. 128, 45 L. ed. 186).

■ Many authorities, such as the decisions of the Supreme Court of the United States and the courts of many of our sister jurisdictions, have been cited by eminent counsel in support of the proposition that section 1 of the act of 1935 (Ga. L. 1935, p. 139) offends art. 1, sec. 1, par. 2, and art. 1, sec. 1, par. 3, of the constitution of Georgia, and is also violative of the fourteenth amendment to the constitution of the United States. One basis of the argument is the contention that the provision of the act which relieves mutual fire-insurance companies from the provision applicable to stock fire-insurance companies, that no local fire-insurance agent can be appointed who holds a salaried position with a stock fire-insurance company, is arbitrary, unreasonable, and capricious, and bears no reasonable relation to the subject or to the public or anything which is within the police power of the State. Therefore it is apparent that the question for our determination is

whether the General Assembly, in the passage of the provision with relation to mutual fire-insurance companies, exceeded its constitutional power, in determining the regulations to be applied to occupational taxes, to classify businesses. It is not to be denied that there is a limit to the power of classification, beyond which a General Assembly can not go. It is readily conceded that a mere difference in the nature or character of the two businesses which it is sought to regulate by legislative enactment will not be sufficient to justify separate classification of each business into different classes. But when it is quite evident (as we think in this case) that both classes of a business are affected with a great public interest in which all the citizens of the State are concerned, and a radical difference is found by which great injury will result to the public if like regulations be applied to the subject-matter, there arises in behalf of the public the right to classification. If, as charged in the petition for mandamus in this case, the distinction drawn by the General Assembly is arbitrary, capricious, and not based upon reasonable grounds, but upon grounds which have no reasonable relation to the subject, it perhaps might be admitted that section 1 of the act of 1935 which it is sought to obliterate and wipe from the statute book is unconstitutional. To the contrary, we are of the opinion that this portion of the act of 1935, supra, only recognizes the inherent sovereign right of the State of Georgia to properly classify a business done within its borders, and impressed with a public interest, which the State could rightfully altogether forbid to be carried on within the State.

That there is a radical difference (and the word "radical," taken from the Latin, means a difference in·the root) between stock insurance companies and mutual insurance companies, was held by this court in *Carlton* v. *Southern Mutual Insurance Co.*, supra. All the reasons given by this court for the wide distinction between mutual life-insurance companies and stock life-insurance companies apply with equal force when fire insurance is·involved, as in this case. In that case it was held: "A mutual insurance company is based upon the idea that each of the assured becomes one of the insurers, thereby becoming interested in the profits and liable for the losses. Without a charter, such an organization would be governed by the general law of partnership. When incorporated, they are subject to the terms of their charter. The charter stands·in

the place of articles of partnership, and modifies the general law as respects losses and profits where the two conflict. But, except as changed by the charter, equity will apply the general laws of partnership in respect to interest in and division of profits. . . The fundamental principle at the base of all partnerships is a division of profits or losses in some form or degree, equal or otherwise, as the terms may be; and in a mutual insurance company the idea of mutuality involves the result that each assured becomes interested in profits and liable for losses." The opinion delivered by Chief Justice Jackson is too long to quote fully many of the sentences pointing out the essential difference between a mutual insurance company and a stock insurance company. We content ourselves with quoting only two sentences, though the thought is more than once repeated in the opinion: "It will thus be seen that the fundamental principle on which this opinion rests is, that this company, by its charter, became a mutual company; that no amendment thereto has altered the nature breathed into it when first the General Assembly gave it birth, but it remains today a mutual insurance company; that thus liability for losses and participation in profits became an ingredient in the character of each assured and insurer, and therefore, when each paid up his whole liability for losses, he became entitled to share the profits. The venture was mutual between all the members; and while the legal title was in the corporation to everything, the equitable interest was in the corporators, whose contributions made it all." What the legislature sought to do in section 1 of the act of 1935, supra, is analogous to the different classifications which have been made as to interest rates to be paid by different classes in borrowing. This court upheld many years ago, and later, laws which placed building and loan associations in an entirely different class from borrowers of money who were not members of a building and loan association, with the result that many borrowers finally had to pay a rate of interest far beyond eight per cent. In some cases the lender was permitted to lend money for an agreed term of years, calculate the interest for the entire time at eight per cent., and divide the same by the number of months, thus agreeing to pay practically sixteen per cent. Code, § 16-101. Under § 57-116, while the general maximum contract rate was still eight per cent., the lender was permitted to lend at six per cent. for an agreed number of years,

and add the interest and principal and receive monthly payments, thus making the interest rate twelve per cent. And though by the small-loan act of 1920 (§ 25-313) lenders were permitted to charge interest at the rate of three and one half per cent. per month, this was reduced to one and one half per cent. by an act approved March 26, 1935 (Ga. L. 1935, p. 394).

We agree with learned counsel for the defendant in error that " (1) mere difference is not enough; (2) the classification must be reasonable, and not arbitrary; (3) the difference upon which the classification is based must bear some reasonable relation to the purposes of the legislation;" but we can not agree with them that "The difference in the method required is not only arbitrary, as heretofore pointed out, but furthermore the discrimination as between the types of companies and their agents rests on a difference which has no reasonable relationship to the legislative purpose." As pointed out in *Carllon* v. *Southern Mutual Insurance Co.,* supra, every officer, whether he be at the top or a mere local agent, in a mutual company is interested in the profits and losses of the concern. Not so with a stock insurance company. The legislature seemed to be well aware of what this court and every other court knows—that the local agent is largely dependent upon insurers for being able to procure any business, and that one who wishes to insure his home generally takes his insurance to a friend in whom he has confidence; and for this reason they incorporated in section 1 the provision that a salaried officer of a stock insurance company could not be a resident agent. Counsel for the petitioner for mandamus plants his whole case upon the alleged discrimination in the portion of the act which relieves mutual companies from the foregoing provision. It is an old rule of jurisprudence in this court that if this court has any doubt as to the constitutionality of an act, the benefit of the doubt will be given in favor of constitutionality. In this case we are not troubled with any doubt; for our opinion is that the section of the act of 1935 which is attacked does not offend either the State or the Federal constitution. The learned judge erred in making the mandamus nisi absolute, and in requiring the insurance commissioner to issue a license contrary to the provisions of the act of 1935.

*Judgment reversed. All the Justices concur, except Gilbert and Hutcheson, JJ., who dissent.*

26

GILBERT, Justice, dissenting. It is settled that the business of insurance is affected with the public interest. Therefore it may be regulated by the State; but it is equally well settled that such regulation must not be arbitrary and must operate constitutionally. "No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government. . . It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and that in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification,—and is not a mere arbitrary selection." Gulf &c. Ry. Co. v. Ellis, 165 U. S. 150, 160 (17 Sup. Ct. 255, 41 L. ed. 666). In Louisville Gas & Electric Co. v. Coleman, 277 U. S. 32 (48 Sup. Ct. 423, 72 L. ed. 770), it was said: "The classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U. S. 412, 415 [40 Sup. Ct. 560, 64 L. ed. 989]; Air-Way Corp. v. Day, 266 U. S. 71, 85 [45 Sup. Ct. 12, 69 L. ed. 169]; Schlesinger v. Wisconsin, 270 U. S. 230, 240 [46 Sup. Ct. 260, 70 L. ed. 557]. That is to say, *mere* difference is not enough; the attempted classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis.' Gulf, Colorado and Santa Fé Ry. v. Ellis, 165 U. S. 150, 155 [17 Sup. Ct. 255, 41 L. ed. 666]. Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." In *Gregory* v. *Quarles,* 172 *Ga.* 45, 48 (157 S. E. 306), Mr. Justice Atkinson discussed a similar question, and spoke for the entire court on the subject of reasonable classification of business. It was there stated that "There should be some reasonable ground for such subclassification, some difference which bears a just and proper relation to the attempted classification; . . some reason connected with or growing out of that paramount cause (public health) relied on for

justification of the ordinance." Numerous authorities supporting these principles might be cited.

It is readily conceded that a just classification for some purposes might be made as between mutual companies and stock companies, but it does not follow that the same classification may be legally made as between mere employees of such companies. It is a matter of common knowledge that insurance agencies accept business subject to approval by the companies which they represent. It is not apparent, either from the statute or the brief of the plaintiff in error, how or in what manner the employee who accepts applications for insurance may affect the rights of those who are insured, or how the duties of the one affect the public interest differently from the other. The mere fact that one is an employee of a stock company, and therefore receives compensation from such company, does not stand upon any substantially different footing towards the insured than an employee doing the same business and employed by a mutual company. Neither of them can affect the rates or the terms of the contract. The terms of the statute apply not only to such employees of stock companies as may be paid a stipulated salary, but apparently apply to all such employees who receive any compensation, whether by salary or otherwise, from the company. Any such employee can not, under the statute, be licensed to do the business of an insurance agent. The statute does not undertake to regulate insurance agents. At one stroke it puts out of business one class. It restricts all such business to the competitor who is an employee of a mutual company. The only difference is that in one case the employee receives compensation from a stock company, and is forbidden to carry on the business, whereas if such an employee is an employee of a mutual company, he may be legally licensed to do business. It clearly is intended to impose a handicap on stock companies, so that the competitor will not be on even terms. If this may be constitutionally done, then the next step may easily follow—the actual outlawing of stock insurance companies. If this may be done in the case of insurance companies, it may be done in the case of any business affected with a public interest. I think the statute is unconstitutional and subject to the attacks made by the defendant in error, because there is no just and proper relation to the object sought. The classification is wholly unreasonable and arbitrary.

HUTCHESON, Justice, dissenting. An act of the General Assembly approved March 28, 1935 (Ga. L. 1935, p. 139, sec. 1), provides as follows: "No licensed fire or casualty insurance company or company writing fidelity or surety bonds shall write or issue any policy or indemnity contract on any risk in this State, except through a resident agent licensed by the insurance commissioner. . . The words 'resident agent' as used in this section are deemed to mean resident agents engaged in the solicitation of such business from the public generally, and shall not include any salaried employee of any insurance company doing business in this State; but shall include any agents of mutual insurance companies however compensated." The Hartford Steam Boiler Inspection and Insurance Company, a stock company duly authorized to do a casualty insurance business in this State, and W. M. Francis, a salaried employee of such company, applied to the insurance commissioner for a license to be issued to such employee as an agent of the company to write or issue policies of insurance in its behalf. The commissioner refused to issue the license, upon the sole ground that under the act of 1935 a license could not be issued to any salaried employee of such company. Whereupon the applicants filed a suit for the writ of mandamus to compel the commissioner to issue a license to such employee in accordance with the application, contending that the provision of this statute which prohibits the licensing of a salaried employee, as distinguished from an employee who is compensated on a commission basis, is repugnant to the due-process clauses of the State and Federal constitutions, and also that the exemption of agents of mutual insurance companies, however compensated, results in an unreasonable and arbitrary discrimination against the plaintiffs, causing the act to offend the equal-protection clauses of such constitutions. Upon the trial of the mandamus case the court held that the provisions in question were unconstitutional on both grounds, and granted a mandamus absolute. To this judgment the insurance commissioner excepted.

1. The statute does not attempt to prescribe the amount of compensation to be paid to agents of insurance companies (cf. O'Gorman v. Hartford Ins. Co., 282 U. S. 251, 51 Sup. Ct. 130, 75 L. ed. 324), but as to stock companies places a restraint upon the *manner* of compensation to the extent of prohibiting license

to any employee who is compensated by salary instead of by commissions. The mere mode of compensation as between salary and commissions is a matter which does not bear any reasonable relation to the public interest or welfare, and therefore the statute deprives the plaintiff insurance company, which is authorized to do business in this State, as well as its salaried employee, of liberty and property without due process of law, in violation of the constitution of this State and the constitution of the United States. Article 3, section 7, paragraph 22, of the constitution of Georgia (Code, § 2-1822); *Smith* v. *Atlanta,* 161 *Ga.* 769, 775 (132 S. E. 66, 54 A. L. R. 1001); *Gregory* v. *Quarles,* 172 *Ga.* 45 (supra); Liggett Co. v. Baldridge, 278 U. S. 105 (supra); Adair v. United States, 208 U. S. 161 (supra); Coppage v. Kansas, 236 U. S. 1 (supra); Burns Baking Co. v. Bryan, 264 U. S. 504 (44 Sup. Ct. 412, 68 L. ed. 813); People v. Ringe, 197 N. Y. 143 (90 N. E. 451, 27 L. R. A. (N. S.) 528, 18 Ann. Cas. 474); Hauser v. North British & Mercantile Ins. Co., 206 N. Y. 455 (100 N. E. 52, 42 L. R. A. (N. S.) 1139, Ann. Cas. 1914B, 263); Franklin Fire Ins. Co. v. Montoya, 32 N. Mex. 88 (251 Pac. 390); Northwestern National Ins. Co. v. Fishback, 130 Wash. 490 (228 Pac. 516, 36 A. L. R. 1507).

2. While there is a difference between stock companies and mutual companies engaged in the insurance business, the difference is not such as bears any reasonable relationship to the mere manner of compensating agents, and thus does not afford a sufficient basis for classifying such companies for the purpose of providing that the one may not compensate its agents by salary, while the other may remunerate its agents either by salary or commissions. It follows that the exemption as to agents of mutual companies contains an arbitrary and unwarranted discrimination against stock companies and their salaried agents, and renders the challenged provisions of the statute contrary to the equal-protection clauses of the State and the Federal constitutions. *Gregory* v. *Quarles,* supra; Louisville Gas & Electric Co. v. Coleman, 277 U. S. 32 (48 Sup. Ct. 423, 72 L. ed. 770); Quaker City Cab Co. v. Pennsylvania, 277 U. S. 389 (48 Sup. Ct. 553, 72 L. ed. 927). It is my opinion that the judgment should be affirmed.